**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Bankruptcy No. 20 B 09807 |
| | ) | Chapter 7 |
| **JELENA DORDEVIC,** | ) | |
| | ) | |
| Debtor. | ) | Honorable Donald R. Cassling |
| | ) | |
| | ) | |
| | ) | |
| **GUS PALOIAN,** not individually, | ) | |
| but solely in his capacity as the duly | ) | |
| appointed Trustee for the estate of | ) | |
| Jelena Dordevic, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 20 A 00340 |
| | ) | |
| v. | ) | |
| | ) | |
| **JORGOVANKA DORDEVIC,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Defendant Jorgovanka Dordevic ("Jorgovanka") is the mother of Debtor Jelena Dordevic ("Debtor"). Jorgovanka claims a 50% membership interest in PHMX LLC ("PHMX"), a Florida company. PHMX owns commercial real estate in Florida on which it is constructing a factory to produce injectable pharmaceuticals. This real estate and the improvements thereon constitute PHMX's sole assets. (Tr. 154:2-11.)[1]

Plaintiff Gus Paloian is the Chapter 7 Trustee for Debtor's bankruptcy case. It is his contention that Jorgovanka's membership interest in PHMX is a sham designed to shield this asset from the creditors of Debtor, the true equitable owner. In support of this contention, the Trustee points to the following facts established at trial:

- Jorgovanka, a Serbian immigrant who cannot read, write, or speak English, (Tr. 264:1-6), has no expertise in pharmaceuticals, factory construction, engineering, or any other skill that would be useful in running an enterprise like PHMX. (Tr. 310:19-23.)

---

[1]    There are three transcripts to which the Court will cite: (1) the transcript of the trial in this Court ("Tr. _"); (2) the transcript of Debtor's meeting of creditors (Compl. at Ex. C ("341 Tr. _"), Adv. Dkt. No. 1, Bankr. No. 20 B 9807, Adv. No. 21 A 32); and (3) the transcript of a Bankruptcy Rule 2004 examination of Debtor by her secured creditors (Compl. at Ex. B ("2004 Tr. _"), Bankr. No. 20 B 9807, Adv. No. 21 A 32).

- Jorgovanka is employed as a cook at a Serbian restaurant in metropolitan Chicago, earning $36,000 a year. (Tr. 122:17-24.) She lives with her daughter Debtor, who, for at least three years, has claimed Jorgovanka as a dependent on her tax returns. (Tr. 362:5-7 & 363:1-10.) Jorgovanka therefore presumably lacks the financial means to have invested in her purported interest in PHMX.
- Before filing for bankruptcy, Debtor was incarcerated in Wisconsin for several weeks on a charge of immigration fraud, apparently based on allegations that she entered into a sham marriage with her former husband, identified as Steven Wilder, for the purpose of immigrating to this country. (Tr. 366:1-15.) That case is still pending. Several witnesses testified at the trial that Debtor asked the other 50% member of PHMX to list Jorgovanka as co-owner to hide Debtor's actual membership from the immigration authorities. (*E.g.*, Tr. 30:18-25.)
- Documentary and oral testimony establish that Debtor, not Jorgovanka, caused approximately $773,250 in wire transfers to be made to PHMX's general contractor, Pharmix, Inc. ("Pharmix") to cover the expenses of constructing the factory, (Trustee's Ex. 17; Tr. 340:18-20), and that these funds were the consideration for Debtor's 50% membership interest in PHMX.
- Debtor has been actively involved in the PHMX project, primarily by handling expenditures and funding. This assistance arguably constituted additional consideration for her membership interest, as well as evidence of her efforts to protect her equitable interest in PHMX.

Treating these facts as a whole, the Trustee argues that they clearly establish that he is entitled to recover Jorgovanka's 50% membership interest in PHMX for the benefit of creditors of Debtor's estate.

Jorgovanka counters that, while it might appear from the documents that Debtor made $773,250 in wire transfers to Pharmix, that was not what really happened. Rather, she presented testimony to demonstrate that each wire transfer from Debtor to Pharmix actually reflected the use of the same funds to effect three underlying and separate transactions:

1. Partial payments from Debtor to Nikola Zaric ("Zaric") under an earlier Stock Purchase Agreement (Def.'s Ex. 11);
2. Loans from Zaric to Jorgovanka pursuant to a Nominee Agreement (Trustee's Ex. 49) and Secured Promissory Note (Trustee's Ex. 50); and
3. Investments by Jorgovanka in PHMX.

Jorgovanka also claims to have actively participated in the management of PHMX. (Tr. 291:14-292:7.)

For the reasons stated below, the Court rejects Jorgovanka's argument and finds that Debtor is the true equitable owner of a 50% membership interest in PHMX.

## STATEMENT OF LAW

In his three-count complaint, the Trustee seeks: (1) a judgment declaring that Jorgovanka's membership interest in PHMX is property of the estate under 11 U.S.C. § 541; (2) turnover of

2

Jorgovanka's membership interest in PHMX under 11 U.S.C. § 542; and (3) an injunction enjoining the sale of Jorgovanka's membership interest in PHMX until the Court adjudicates whether that property constitutes property of the estate. The Trustee has met his burden on the first two counts;[2] the third is moot.

Upon filing her Chapter 7 bankruptcy case, an estate was created comprised of Debtor's property. *See* 11 U.S.C. § 541(a); *City of Chi., Ill. v. Fulton*, 141 S.Ct. 585, 589 (2021). Property of the estate is "broad[ly]" defined by the Bankruptcy Code, *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983), encompassing "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Indeed, "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993). "Although what constitutes property of the estate is a question of federal law, under § 541, state law determines whether a debtor has an interest in property in the first instance." *In re McInerney*, 609 B.R. 497, 503 (Bankr. N.D. Ill. 2019) (citing *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) and *Butner v. United States*, 440 U.S. 48, 54-55 (1979)).

This adversary proceeding concerns who owns the rights in Jorgovanka's record ownership of a 50% membership interest in PHMX. The Trustee argues that Jorgovanka is merely Debtor's nominee and that Debtor holds the equitable interest in the membership arising from her beneficial ownership. In general terms, a "nominee is one who holds bare legal title to property for the benefit of another." *May v. United States*, 07-10531, 2007 WL 3287513, *1 (11th Cir. Nov. 8, 2007) (citation omitted) (lien attached to property for which taxpayer's wife was titleholder). Because Debtor retains the equitable interests in properties held by her nominees, *see Gurley v. United States (In re Gurley)*, 357 B.R. 868, 872 (Bankr. M.D. Fla. 2006), the Trustee seeks declaratory relief that the 50% membership interest in PHMX is property of the bankruptcy estate. The Trustee seeks that declaration so that he may seek turnover of that membership and, ultimately, sell it to a potential investor from whom he has received an informal offer.

The Court must look initially to state law to determine what property interests a debtor owns, *see Butner*, 440 U.S. at 54-55. PHMX was formed in Florida, but there is no bright-line test under Florida law for determining nominee ownership. *See United States v. Dornbrock*, 06-61669-

---

[2]   Jorgovanka argues in her response brief that the Trustee must prove his case by clear and convincing evidence. (Def.'s Br. at pp. 1-2, Adv. Dkt. No. 78.) The Court disagrees. The language of the relevant provisions of the Bankruptcy Code (Sections 541 and 542) do not prescribe a heightened standard of proof. "This silence is inconsistent with the view that Congress intended to require a special, heightened standard of proof." *Grogan v. Garner*, 498 U.S. 279, 286 (1991). "Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, . . . this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'" *Id.* (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389-90 (1983)). No such special rights are implicated in adjudicating the extent of a debtor's estate. For these reasons, the Trustee need only support his claims with preponderant proof. *See also In re Meyers*, 616 F.3d 626, 630 (7th Cir. 2010) (stating in dictum that "the default preponderance standard that the Supreme Court applied to dischargeability in *Grogan* is probably the appropriate one also for turnover actions[.]"); *see also Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994) (noting that in the absence of controlling precedent the well-reasoned dictum of higher courts "provides the best, though not an infallible, guide to what the law is, and it will ordinarily be the duty of a lower court to be guided by it."). This interpretation also jibes with the broad concept of property of the estate in Section 541(a)(1). *E.g.*, *United States v. Van Allen*, 524 F.3d 814, 822 (7th Cir. 2008).

CIV, 2008 WL 769065, at *5 (S.D. Fla. Jan. 17, 2008), *aff'd*, 309 Fed.Appx. 359 (11th Cir. 2009). Florida law does provide, however, that legal title alone does not determine all property rights, and someone who is not the property's titleholder may hold an ownership interest for various reasons.[3] Because there is no established test for this question under Florida law, it is appropriate for the Court to apply the common-law factors generally applied by federal courts to determine the existence of a nominee relationship. *See Grippo v. Perazzo*, 357 F.3d 1218, 1222 (11th Cir.2004) ("Because Florida law does not answer the question that we examine today, we look to federal law for guidance."); *Daer Holdings, LLC v. Menchise (In re Steffen)*, No. 8:13-CV-1700-T-27, 2014 WL 11428827, at *4 n.6 (M.D. Fla. Mar. 13, 2014) ("While the federal courts generally apply the law of the forum state (in this case, Florida) to resolve nominee, alter-ego and similar questions, Florida, like many states, does not have a bright-line test for determining nominee ownership. Therefore, federal common law applies." (internal quotation omitted)), *aff'd*, 611 F.App'x 677 (11th Cir. 2015); *Battle v. United States*, No. 9:06CV109, 2007 WL 1424553, at *5 (E.D. Tex. Feb. 7, 2007) ("Texas courts have not set forth factors for determining whether an entity is a nominee of another. When Texas law applies to an issue, but Texas law does not address that issue, federal courts will look to federal law for guidance."); *Cody v. United States*, 348 F.Supp.2d 682, 694 (E.D. Va. 2004) ("[F]ederal courts sitting in states whose law of nominee ownership is similarly undeveloped have typically looked to nominee ownership criteria employed in other federal tax collection cases.").

In applying federal law to this issue, the Seventh Circuit has explained that "[c]ourts consider several factors in determining whether a titleholder is actually serving as a nominee for the benefit of another, including whether: (1) there is a close personal relationship between the nominee and the transferor; (2) the nominee paid little or no consideration for the property; (3) the parties placed the property in the name of the nominee in anticipation of collection activity; (4) the parties did not record the conveyance; and, (5) the transferor continues to exercise dominion and control over the property." *United States v. Szaflarski*, 614 F. App'x 836, 838-39 (7th Cir. 2015) (citing *Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 n. 1 (5th Cir. 2000)). The fourth factor is not relevant to this dispute. As discussed below, based on the evidence heard and facts established at trial, each of the other four factors resolves in the Trustee's favor: (1) Jorgovanka and Debtor are immediate family members and Jorgovanka is a dependent of Debtor; (2) Jorgovanka did not contribute either funds or management skills to the development of PHMX; (3) Debtor orchestrated the placement of the membership interest in Jorgovanka's name both to avoid additional problems with the immigration authorities and to shield her assets from her creditors; and (4) Debtor's active involvement in funding and billing activities of the project

---

[3]   *E.g.*, *Towerhouse Condo., Inc. v. Millman*, 475 So. 2d 674, 677 (Fla. 1985) (condominium owners' association held title to land for another parking lot as trustee pro tanto for members who contributed the funds used for that purchase). A resulting trust may also arise when a titleholder purchases property using another person's funds, *Petithomme v. Petithomme*, 232 So. 3d 1058, 1061 (Fla. Dist. Ct. App. 2017), to the extent of the contribution. *Millman*, 475 So. 2d at 677. Such principles also apply to the ownership interests of businesses formed, as alleged to have occurred here, in a nondebtor's name to shield assets from creditors. *See United States v. Charnock (In re Charnock)*, 97 B.R. 619, 624 & 628-29 (Bankr. M.D. Fla. 1989) (determining that the shares of a corporation operated and controlled by the debtor but on paper formed by his wife as its president and sole shareholder to evade creditors were estate property under an alter ego theory). However, the Court will focus its analysis on nominee principles specifically because "[w]hile related, the concepts of 'nominee', 'transferee', and 'alter ego' are independent bases for attaching the property of a third party in satisfaction of a [debt]." *Oxford Cap. Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000).

4

demonstrated her continuing interest to protect her 50% membership interest in PHMX. The Trustee has thus carried his burden of establishing that the membership interest belongs to the estate.

Finally, Section 542(a) of the Code requires anyone who has "possession, custody, or control" of estate property to deliver that property to the trustee and "account for, such property or the value of such property. . . ." 11 U.S.C. § 542(a); *see also Fulton*, 141 S.Ct. at 589. In order to obtain a turnover order against an entity, a trustee must establish that the property at issue belongs to the estate and that the entity had control or possession of the property during the pendency of the bankruptcy case. *Bank of Am., N.A. v. Veluchamy, (In re Veluchamy)*, 524 B.R. 277, 323 (Bankr. N.D. Ill. 2014), *aff'd*, 879 F.3d 808 (7th Cir. 2018). If the trustee establishes these elements, the entity must turn over the property to the trustee or become liable for its value. *In re USA Diversified Prods., Inc.*, 100 F.3d 53, 56-57 (7th Cir. 1996). Only the first element is in dispute and, for the reasons discussed below, the Trustee has proven that the membership interest belongs to the estate. For that reason, he is entitled to have it turned over to him for administration.

## STATEMENT OF FACTS

### The PHMX Project

PHMX and Pharmix are separate companies founded by Shogher Zargaryan ("Shogher") to construct and operate a facility for the manufacture of compound pharmaceuticals on a cost-efficient but customizable basis.[4] For ease of reference, the Court will refer to their combined operations as the "PHMX Project."

PHMX's role in this project is to provide the site on which the Pharmix factory is being built. Pharmix's roles are to act as the general contractor for the construction of the factory, operate the completed factory, and produce and sell the compound pharmaceuticals. PHMX will retain ownership of the real estate and factory.

PHMX is owned in equal shares by Shogher and, nominally, Jorgovanka. (Tr. 154:7-22.) Pharmix is wholly owned by Shogher. (Tr. 153:17-25.)

The Trustee is not seeking to obtain possession of any assets or equity of Pharmix. He is seeking only to recover a 50% membership interest in PHMX.

### Personal and Business Relationships between Debtor and Zaric

Debtor and Zaric were both born and raised in Niš, Serbia. (Tr. 385:6-12 & 412:21-413:6.) Their families had known each other for generations, lived in close proximity, and were "like family." (*Id.*) Their fathers were both in the trucking business in Serbia. (Tr. 326:18-21 & 414:12-20.) Debtor and Zaric have been very close friends their entire lives. (Tr. 412:21-413:6.)

---

[4]  A more complete description of Pharmix's business was provided by Def. Ex. 8, the only document presented at trial which offered a detailed explanation of Pharmix and its products. It was prepared by Shogher and her son for presentation to potential investors and engineers. (Tr. 199:4:16.) No witness or party has suggested that its general description of Pharmix's business is inaccurate.

Both Debtor and Zaric were educated in Serbia, Debtor completing two years of college studying economics from a college whose name she cannot recall, (2004 Tr. 35:9-36:4), and Zaric obtaining a medical degree. (Tr. 412:5-10.) Debtor immigrated to the United States in 2008, (2004 Tr. 36:5-7), and Zaric sometime prior to 2009.[5] Debtor's mother, Jorgovanka, followed them in 2015. (Tr. 120:20-22.)

In the United States, the personal relationship between Debtor and Zaric became intimate and included vacationing together.[6] (Tr. 532:19-533:16.) They also pursued multiple business ventures together, including co-founding a trucking company, Arrow Freight, Inc ("Arrow Freight). Arrow Freight was started with a single truck and grew to over 75 trucks and 15 trailers by 2015. (Tr. 414:21-415:1.) By that time Zaric had started a number of other businesses, including yet another trucking company, which he wished to take public. (Tr. 415:20-416:19.) He believed that this would require divestiture of his ownership interest in competing trucking companies, specifically including Arrow Freight. (Tr. 418:6-419:16.) He offered to sell Debtor his stock in Arrow Freight for $800,000. Because of its cashflow problems, he also agreed to loan another company of Debtor's, GTR Group, Inc., ("GTR") $100,000. (Tr. 419:7-420:4 & 481:6-25.) Debtor therefore agreed to execute a Stock Sale and Purchase Agreement for the Arrow Freight stock for $800,000 and also caused GTR to execute a promissory note for $100,000 in Zaric's favor. (Def.'s Ex. 11; Trustee's Ex. 59.)

After buying out Zaric's interest, Debtor exercised complete control over the Arrow Freight and GTR business accounts. Those two accounts were the source of most of the funds she eventually wire-transferred to Pharmix.[7] (Trustee's Ex. 17; Tr. 337:16-20 & 339:20-22.)

Debtor continued to grow the Arrow Freight business after Zaric's departure, eventually amassing over 100 trucks. (2004 Tr. 53:10-54:1.) At its height, Arrow Freight was grossing about $3 million a year. (341 Tr. 11:21-24.) Debtor and Zaric continued their close personal relationship throughout this period.

Arrow Freight and GTR were both highly leveraged. Debtor purchased their entire fleets through loans secured by the vehicles, as well as by her personal guaranty of each loan. (*See* 2004 Tr. 116:19-118:18.) Because her personal guarantees mirror the business loans for the fleet purchases, the personal debts listed on her bankruptcy schedules are an accurate measure of the equivalent debts of Arrow Freight and GTR. As of April 24, 2020, the date she filed for bankruptcy, her personal guarantees on these secured vehicle loans to Arrow Freight and GTR totaled $4,611,170.23. (Trustee's Ex. 57 at pp. 27-46.) In addition, she obtained an SBA loan in the amount of $336,000 for Arrow Freight, secured by her personal guaranty and a second mortgage on her home She ultimately shut down the operations of both companies in 2019, (341

---

[5]   The Court presumes that it was in or before 2009, because that is the year in which they jointly founded Arrow Freight, Inc. in the United States. (Tr. 414:12-15.)

[6]   Kari and Nick Kazumian testified that, when they met Debtor and Zaric on a cruise, the latter identified themselves as husband and wife. (Tr. 24:17-20 & 613:17-25.) Debtor and Zaric testified that they have never been married. (Tr. 366:1 & 413:7-22.)

[7]   No witness suggested that these payments were in furtherance of Arrow Freight's or GTR's business interests. Rather, the testimony was consistent with the conclusion that they were made in furtherance of Debtor's personal interests.

Tr. 20:20-22), and filed for personal bankruptcy in April of 2020. (Bankr. Dkt. No. 1.) At her first meeting of creditors, Debtor revealed that prior to her filing she had somehow "lost" all of the trucks and trailers that constituted the collateral of Arrow Freight's and GTR's secured creditors and was unable to account for their whereabouts. (341 Tr. 80:15-17 & 87:9-23; 2004 Tr. 119:22-120:5 & 152:10-17.)

### Jorgovanka Dordevic

Prior to emigrating from Serbia to the United States, Jorgovanka was employed as a manager of a restaurant. (Tr. 280:6-14.) Trial testimony was devoid of any reference to any work experience or training outside the restaurant business or her husband's trucking business. For her first three years in the United States, she was unemployed. (Tr. 120:23-121:1.) Since 2019 she has worked as a cook at the Dunav Restaurant, a Serbian restaurant in the Chicago area, earning $36,000 a year. (Tr. 122:17-24.) No evidence was offered at trial that she has any other source of income, investments, or substantial assets in the United States and she has never filed an income tax return.[8] (Tr. 121:9-12.) Since arriving in the United States she has lived with Debtor, who claimed Jorgovanka as a dependent on her tax returns for at least the last three years. (Trustee's Exs. 54-56; Tr. 362:5-7 & 363:1-10.)

Jorgovanka does not speak, read, or write English. (Tr. 124:22-125:1.) Her only language is Serbian. She testified at trial in Serbian with the aid of an interpreter.

### Creation of the PHMX Project

Pharmix and PHMX are the brain-children of Shogher. She was born and educated in Armenia, earning a master's degree in industrial mechanical engineering, and immigrated to the United States in 2011. (Tr. 150:12-21.) She is multi-lingual, including, apparently, at least some English but no Serbian. (Tr. 159:1-20.) She testified at trial in Armenian with the aid of an interpreter.

In addition to running PHMX and Pharmix, she works for USA Products, a company that manufactures surgical products. (Tr. 150:25-151:5.) Trial testimony detailed Shogher's extensive experience in the medical industry. Since 2015 she has focused on research and development related to the production of customizable compound pharmaceuticals. (Def.'s Ex. 8; *see also* Tr. 151:7-21.) She has designed, and is in the process of patenting, specialized machinery for use in a sterile injectable pharmaceutical production line. (*Id*.) This technology is the foundation of the PHMX Project, a pharmaceutical compounding enterprise.

Shogher brought her son Nick Kazumian into the PHMX Project. In Nick's words, "she asked me to help her on the technology side. To create a technological line. How to form this whole idea around manufacturing it." (Tr. 612:6-9.) Nick holds PhDs in both engineering and psychology. (Tr. 153:14-15.) He currently works as a project manager for the United States Department of Defense and has prior work experience with the "U.S. military and Department of Defense and various other governmental agencies." (Tr. 610:6-17.) According to Nick, the PHMX

---

[8] She and her son, Igor, both testified that the family has an unspecified amount of cash sitting in a safe in their home in Serbia. (Tr. 283:18-284:2 & 323:6-324:14.) Neither witness testified that any of that money was ever transferred to the United States.

7

Project required a "style of manufacturing where you have to custom make everything," (Tr. 629:10-11), including specialized multi-functional machinery and robotics. (Tr. 627:22-629:15.) Pharmix is subject to FDA regulations requiring that a highly sterilized environment be maintained in the manufacturing process. (*Id.*)

Kari Kazumian is Nick Kazumian's ex-wife and Shogher's former daughter-in-law. (Tr. 22:14-17.) She worked as an assistant to Shogher on the PHMX Project from 2018 until she began her current position as a governmental contractor for the United States Department of Defense. (Tr. 23:12-24:9.) She has both a bachelor's and master's degree in psychology, as well as a certificate of business management from the European School, CCMA. (Tr. 23:7-11.)

Debtor's and Zaric's Participation in the PHMX Project

Shogher was seeking investors in the PHMX Project when, in late 2016 or early 2017, Nick and Kari met Debtor and Zaric on a cruise. (Tr. 24:17-24.) Kari and Nick testified that Debtor and Zaric identified themselves as a married couple. The two couples became friendly, and Kari and Nick testified that they discussed the PHMX Project in some detail with Debtor and Zaric. (*E.g.*, Tr. 62:4-19 & 371:1-12.) Nick testified that Debtor expressed an interest in investing in the project, having grown tired of the trucking business. (Tr. 630:22-631:2.) But Zaric testified that Nick approached him to invest in the project, and that Debtor was offered, but turned down, the opportunity to invest in it when the PHMX Project began to take shape and the scope of the investment became too large. (Tr. 439:13-20.) In either case, all four appear to be in agreement that they discussed the project in some detail and that either Debtor or Zaric expressed an interest in investing in it.

After the cruise, Nick spoke with Shogher, who agreed to bring in Debtor as an additional partner. (Tr. 24:10-16 & 26:21-27:6.) An agreement was reached and reduced to writing, splitting membership of PHMX 50/50 between Shogher and the new investor. (Tr. 30:10-17.)

Kari testified that Debtor was understood to be the real investor, but that Debtor requested that her name be kept off the agreement and that Jorgovanka's name be inserted as the nominal owner of Debtor's 50% membership interest in PHMX. (Tr. 30:18-31:6.) Debtor felt that this step was necessary to avoid additional problems with the immigration authorities.[9] (*Id.*) In August of 2017, both Debtor and Zaric were charged with immigration fraud, based on allegations that

---

[9]   Shogher testified that, "for a short period of time, [Debtor] requested that we put her mother's name, Jorgovanka, on the deed or on the business because she has immigration issues." (Tr. 154:14-17 & 155:11-22.) That request was made in May 2018. (Tr. 155:2-10.) Then, this question was asked and this answer given:

> Q. What did [Debtor] specifically state to you about wanting to put her mother as the owner of the property on a temporary basis?

> A. So then she has great difficulties with the immigration office, and I am aware that she was detained for several months for those issues. I don't know exactly where they detained them and keep them. So in order to be able to be involved in the projects and be a partner, she asked if for a short period of time I could allow her mom's name to be on the papers.

(Tr. 155:11-22.)

Debtor had engaged in a sham marriage in order to obtain permanent residence in the United States.[10] (Tr. 364:3-366:15.)

Zaric testified that *he,* not Debtor, was the one who requested that Jorgovanka be identified as the owner of the 50% membership interest of PHMX in the written agreement. His testimony was that Nick Kazumian had suggested that both sides name figure-head nominees to hold the memberships in the stead of the *real* investors, in order to shield the real members of PHMX from potential product-liability issues. (Tr. 448:6-23.) He testified that Nick had chosen his mother, Shogher, as the figure-head owner of 50% of PHMX and suggested that Zaric nominate his father to be the nominee for the other 50%. Zaric testified that his father could not fill this role because of health problems. (Tr. 448:18-22.) Therefore, according to Zaric, he recruited Jorgovanka, whom he had known since his childhood, to fill that role and she agreed. (Tr. 450:15-451:24.)

<u>Construction and Financing of the PHMX Project</u>

PHMX purchased a property located at 15550 NW 7 Avenue, Miami, Florida, for approximately $650,000, making a down payment of $60,000 and financing the balance. (Tr. 165:8-20.) PHMX then obtained the necessary zoning variances to permit construction of the Pharmix factory on that real estate. (Tr. 31:23-32:4.) Kari and Debtor attended the zoning hearings as representatives of PHMX. (Tr. 32:12-16 & 353:20-354:2.)

Pharmix, as general contractor for the construction of the factory, hired the workers and purchased the materials necessary to begin construction. Pharmix also started purchasing the machinery and equipment that would be used in the factory. (Tr. 67:18-24.) Part of these costs was covered by a $1,000,000 construction loan. (Tr. 45:15-46:2 & 165:17-20.) But approximately $773,250 of it was provided by wire transfers from three different accounts, all controlled by Debtor: her personal account, the business account of Arrow Freight, and the business account of GTR.[11] (Tr. 340:18-20; Trustee's Ex. 17.) There is a factual dispute as to these wire transfers. Debtor and Zaric testified that in initiating the transfers Debtor was following explicit oral instructions from Zaric as to amounts and timing, as they were intended as partial payments on the debt to Zaric for the purchase of Zaric's stock in Arrow Freight and his loan to GTR.[12] (*E.g.*, Tr. 391:2-8.) However, testimony from Shogher, Kari, and Nick, as well as contemporaneous text

---

[10] Debtor testified that the allegations regarding the sham marriage related to her first marriage to Steven Wilder (stenographer's phonetic spelling), who was not otherwise identified in her testimony before this Court. (Tr. 366:9-11.) The evidence presented before this Court did not clarify whether Debtor's immigration case had any bearing on her and Zaric's testimony that they had never been married, (Tr. 366:1 & 412:21-413:13), contrary to Nick's and Kari's testimony that Debtor and Zaric had introduced themselves as husband and wife. (Tr. 61:10-15 & 613:17-25.)

[11] Debtor caused one additional wire transfer in the amount of $2,500 to be made by Sprint Freight, Inc., another trucking company she controlled. *See note* 15 *infra.*

[12] For example, Debtor was asked the following questions and gave the following answers at trial: "Q. Now, when you would send money down to Pharmix, you waited for Nick to tell you when and how much, is that right? A. Yes. Q. You just didn't send it yourself just to send money, right? A. Never. It was all [Zaric's] instruction." (Tr. 391:2-8.)

messages and emails between Debtor and Kari portray Debtor as acting entirely on her own account in making the wire transfers.[13]

## DISCUSSION

### Witness Credibility Determinations

When dealing with conflicting testimony of witnesses, a court should determine and favor the testimony which was coherent, facially plausible, and uncontradicted by documentary or objective evidence. *In re Pearson Bros. Co.*, 787 F.2d 1157, 1162 (7th Cir. 1986). The Court is in the best position to assess the credibility of the witnesses and weigh the evidence. *See Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (noting that deference is given to a trial court's findings that involve credibility of witnesses because only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is stated); *Torres v. Wis. Dept. of Health & Social Servs.*, 838 F.2d 944, 946 (7th Cir. 1988) (citing Anderson). "[A] court ... may take into account a witness'[s] interest in the outcome of the case, his intentions, his seeming honesty, and his conduct on the witness stand." *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 87 (Bankr. N.D. Ill. 2002) (citing *Welch v. Tenn. Valley Auth.*, 108 F.2d 95, 101 (6th Cir. 1939)).

Although the Trustee stands in the shoes of Debtor in bringing this action, he placed no reliance upon Debtor's trial testimony in support of his argument. Indeed, in post-trial submissions he takes pains to catalog examples of her testimony being contradicted by exhibits (emails and texts) or by oral testimony from other witnesses, including those for the defense. (*E.g.*, Trustee's Br. at pp. 12-13, Adv. Dkt. No. 77.) He also cites her claimed inability to recall facts inconvenient to her position. For instance, the date she created an email account from which she sent PHMX-related business messages purportedly from Jorgovanka. (*Id.* at p. 13; *see also* Tr. 358:24-359:1.) Having weighed Debtor's testimony against the other evidence and having observed her at trial, the Court takes a similarly dim view of her credibility. Most troubling to the Court is Debtor's admission at trial of deliberate omissions from her bankruptcy schedules and her deliberate lies about those omissions in her sworn attestation that the schedules were correct and complete.[14] (Tr. 403:2-404:16.) Questioning by the Trustee elicited this exchange:

Q. If I understood you correctly, you paid $800,000 for the stock in Arrow Freight, is that correct?
A. Well, we made a contract for 800,000, but I believe I still owe money to Nikola Zaric. . . .
Q. . . . You agreed under this stock and purchase agreement to pay Mr. Zaric $800,000 for his Arrow Freight stock, correct?
A. Yes.
Q. All right. And have you ever paid any of that money to Mr. Zaric?

---

[13] Even Jorgovanka testified that Zaric was not responsible for these transfers. (Tr. 303:16-304:15.)

[14] Every debtor is required to affirm, under penalty of perjury, that she has accurately stated her assets and liabilities in the bankruptcy schedules. *See* FED. R. BANKR. P. 1008; *In re Jakovljevic-Ostojic*, 517 B.R. 119, 127 (Bankr. N.D. Ill. 2014).

A. Directly to him, no. I was sending money per his instructions as he told me to send.

Q. Do you still owe money to Mr. Zaric?

A. I do.

Q. So if you still owe money to Mr. Zaric, why didn't you list him as one of your creditors in your bankruptcy filing?

A. Because we – he knew what type of position situation I am that I also filing bankruptcy, that I'm in debt, and as a friend, he didn't want me to put even that burden on me. He know if I ever have chance, I'll pay him back, but I still owe him money.

Q. So you would agree with me that on the list of creditors Schedule D in your bankruptcy filing of April 24, 2020, you did not list Mr. Zaric?

A. Not for the rest of the shares.

Q. So even though you still – much money do you still owe Mr. Zaric?

A. Some around 400 with his paychecks and money additional, yes.

Q. So even though you owe him $400,000, you did not list him on your list of creditors, correct?

A. Correct.

Q. . . . And you didn't list him on the schedules of Exhibit E or Exhibit F in your bankruptcy filing, correct?

A. Not that I remember. I don't remember it, no.

Q. In fact, Mr. Zaric isn't listed anywhere in your bankruptcy filing as somebody you owe money to, correct?

A. Correct.

Q. And you said that he told you to transfer the money that you owed him with respect to the stock purchase directly to Pharmix, correct?

A. Yes.

Q. But you do not have any written agreement between Mr. Zaric and you that specifically says the money you owe me for the stock purchase should go to Pharmix, correct?

A. That's correct. I don't have.

(Tr. 402:16-404:25.)

As the Trustee points out, Debtor's schedules also omitted her ownership interest in Arrow Freight, GTR, and Pro Star Auto Group, LLC, (*e.g.*, 2004 Tr. 57:12-21), as well as her gross income from truck leasing. These omissions also contradicted Debtor's sworn statement that her schedules were complete and accurate. The Court further notes Debtor's lack of candor in testimony she gave at her meeting of creditors. There, she claimed that she had somehow "lost" and could not account for the whereabouts of a fleet of over 100 trucks and trailers that constituted the collateral of the secured creditors of Arrow Freight and GTR. (341 Tr. 80:15-17 & 87:9-23; *see also* 2004 Tr. 119:22-120:5 & 152:10-17.) In short, throughout her bankruptcy case, Debtor has repeatedly demonstrated to the Court her propensity for prevarication and evasion, even when under oath, in an apparent attempt to place assets beyond the reach of her creditors. The Court therefore gives no weight to her testimony.

Jorgovanka and Zaric are closely connected with Debtor, both personally and financially. While that alone does not destroy their credibility, neither does it enhance it. In particular, Zaric

11

strained the Court's ability to believe him when (as will be discussed further below) he contradicted himself multiple times in his testimony. Nor did either of them give a coherent explanation of two instruments crucial to Jorgovanka's case: the Nominee Agreement and the Secured Promissory Note. (Trustee's Exs. 49-50.)

The Trustee's major witnesses were Shogher, Nick, and Kari. In regard to the PHMX Project, the interests of all three seem to be generally aligned. Because no ruling by this Court will impact Shogher's 50% membership interest in PHMX, or any interest of Nick and Kari, one way or the other, these three witnesses lack Jorgovanka's, Debtor's, and Zaric's financial motivation to shade the truth. The Court found their testimony to be consistent with contemporaneous documents and otherwise credible.

Financial Investment in the PHMX Project

As Jorgovanka herself strongly asserts in her post-trial submissions, the PHMX Project was created by Shogher, Nick, and Kari, not Debtor. (*E.g.*, Def.'s Br. at pp. 8-9.) Indeed, the record establishes that only Shogher, Nick, and Kari possessed the expertise to conceive of and execute a project of that nature on their own. What they lacked was enough money to make it happen. (*E.g.*, Tr. 43:6-13.) So, by the time Debtor, Zaric, or Jorgovanka came on the scene, Shogher, Kari, and Nick, were actively seeking an investor. (Tr. 151:25-152:21.) Accounts offered at trial differ as to the initial discussions among Debtor, Zaric, Nick, and Kari regarding who recruited whom as an investor. But the evidence is clear as to when and where the money eventually invested in the PHMX Project came from. In twenty-seven transactions from July 5, 2017, to February 1, 2019, Debtor wire transferred a total of $773,250 to Pharmix, all from accounts she solely controlled: her personal account and the business accounts of Arrow Freight and GTR.[15] (Tr. 340:18-20; *see also* Trustee's Ex. 17.) No business interest of either Arrow Freight or GTR was served by these transactions. By themselves, these wire transfers strongly support the conclusion that Debtor transferred these funds to purchase a 50% membership interest in PHMX, by herself and for herself.

But Debtor and Zaric testified that, in initiating the wire transfers, she was not really investing in PHMX. Their testimony was that Zaric was the ultimate beneficiary of the wire transfers. They contend that the wire transfers: (1) were all made under Zaric's explicit instructions as to timing and amount (Tr. 391:2-8 & 402:9-12); (2) represented partial payments on Debtor's obligations under the Arrow Freight Stock Sale and Purchase Agreement (Tr. 402:23-403:7); and (3) were payable to Pharmix because Zaric had an interest in that company under the Nominee

---

[15]   One $2,500 wire transfer dated November 30, 2018, came from an account owned by Sprint Freight Inc. That entity seems to be yet another trucking company controlled by Debtor. No evidence was adduced at trial about it or its operations, aside from the understanding of Kari and Shogher that Sprint belonged to Debtor. (Tr. 37:5-9 & 163:3-10.). Debtor testified at her Bankruptcy Rule 2004 examination, however, that Sprint oversaw the leases for her own companies and that it was owned by Aleksander Mircic, (341 Tr. 49:5-52:9), the notary on the Nominee Agreement between Jorgovanka and Zaric. (Trustee's Ex. 49 at p. 3.)

12

Agreement with Jorgovanka, the real investor in 50% of PHMX.[16] (Tr. 560:1-561:1.) None of these assertions withstands scrutiny.

First, Shogher, Nick, and Kari all recounted conversations with Debtor consistent with their understanding that she initiated the wire transfers on her own, not on Zaric's instructions. Contemporaneous emails and text messages between Kari and Debtor support this interpretation.[17] For instance, in a text message dated May 2, 2020, Debtor sought instruction from Kari regarding certain expenses of the PHMX Project that Debtor was to pay:

> Hi Kari, are these expenses half of what is in total? Is there anything else we need to cover?
> . . .
> Can I please have invoices for derm [environmental expenses], concrete and dump?
> Are these expenses from last week?
> Will we need it also for this week and next?
> . . .
> Did Maya transfer money for mortgage, are we ok with it for now?

(Trustee's Ex. 26 at p. 1.)

The same exhibit included a text message from Debtor to Kari dated May 4, 2020:

> Hi Kari, . . . I am figuring out how and what to pay. I remember you telling me that you already pay last week paycheck for employees, was it paid from the loan amount? If yes, why should I pay with my personal?
> For this and following weeks is ok if I need to pay half for employees and other expenses. I don't understand why to pay for last week if it was paid from the loan. Same with all expenses from previous weeks. Just trying to understand.. [sic]
> You never sent me derm phone and what to pay. Also invoice for dump, I do need it for my records.

(*Id*. at p. 3.)

At trial, Debtor's explanation for the text messages and emails quoted above and in footnote 16 was that she was asking these questions and handling these issues not on her own behalf, but on behalf of Jorgovanka. (Tr. 354:3-355:1.) Yet she admitted that she had no written documentation to support this claim. Nor do these very detailed text messages and emails mention

---

[16]   As discussed below, Zaric testified inconsistently as to whether his professed interest in PHMX was (1) solely as a "silent investor" in PHMX (*e.g.*, Tr. 570:21-571:2); (2) as an equitable owner of 50% of PHMX (*e.g.*, Tr. 549:25-550:9.); or (3) as a lender to Jorgovanka (*e.g.*, Tr. 571:24-572:6).

[17]   There were many other examples showing Debtor's direct and significant involvement in the PHMX Project. For example, the Trustee's twenty-second exhibit is a text message from Debtor to Kari in which Debtor proposes adding an additional Serbian investor, a Mr. Ratko, into the PHMX Project because Debtor has run out of available funds to invest. (Tr. 40:15-43:22.) The Trustee's thirty-third exhibit is an email directly from a vendor on the project to Debtor asking her to make payment. Kari testified that this exhibit demonstrated that Debtor was the person responsible on the PHMX Project for setting up vendor payments. (Tr. 48:7-25.) This was further demonstrated by the Trustee's thirty-fourth exhibit, in which the vendor who supplied the portable toilets for the project contacted Debtor to solve a problem he was having with workmen on the PHMX Project blocking access to the toilets with their equipment. (Tr. 49:11-20.)

13

Jorgovanka in any way. (*See* Trustee's Ex. Nos. 22, 26, & 33-34.) These messages are written in the voice of the one principally responsible for handling the payments. And as if there was any doubt left as to Debtor's lack of credibility, the Court notes that she testified that she never had any conversations with Kari about the PHMX Project,[18] despite these contemporaneous documents proving the opposite.

Second, Debtor and Zaric both conceded that there was no written documentation to support their testimony that these wire transfers were really payments on Debtor's debt to Zaric. (Tr. 384:24-385:3 & 420:20-422:6.) Nor could there be. Contrary to the narrative spun by Debtor, Zaric, and Jorgovanka of a series of three-part transactions collapsed into single wire transfers (described earlier in this Opinion), Debtor never transferred any of these funds into accounts controlled by Zaric, Zaric never transferred any of these funds from one of his accounts to Pharmix or into any account controlled by Jorgovanka, and Jorgovanka never transferred any funds to Pharmix. Indeed, the evidence established that Jorgovanka has only had one bank account in the last five years, and that it is a joint account with her children. (Tr. 123:8-124:21 & 262:18-263:2.) The simplest explanation for the wire transfers is that they were just what they appear to be: payments directly to Pharmix by Debtor, from Debtor, for Debtor.

Third, the Nominee Agreement offered by Jorgovanka as proof of Zaric's interest in PHMX raises more questions than it answers. (Trustee's Ex. 49.) On its face, the Nominee Agreement supports the contention that Zaric seemed to be making on his first day of testimony— that in regard to "their combined interest in PHMX," Zaric was the owner and Jorgovanka was his nominee. (*Id.*) This would at least be consistent with Zaric's testimony that when Nick Kazumian first approached him about participating in the PHMX Project, they "decided to be 50/50 partners." (Tr. 440:8-9.) But Nick denied that he had ever discussed being 50/50 partners with Zaric. (Tr. 613:9-16.) The Court finds Nick's testimony to be more credible than Zaric's on this issue. Nick's testimony was clear, internally consistent, and supported by contemporaneous documents, particularly the documents memorializing the wire transfers from Debtor to Pharmix. By contrast, Zaric's testimony was confusing, internally inconsistent, and, on his second day of testimony, also inconsistent with the Nominee Agreement. (Trustee's Ex. 49.) That was when he shifted gears and appeared to disclaim any membership interest in PHMX, instead testifying that Jorgovanka was the sole legal and equitable owner of 50% of PHMX, (*e.g.*, Tr. 571:24-572:6), while he was to remain in the background as a "silent investor" (*e.g.*, Tr. 570:21-571:2).

Zaric testified that his father asked Jorgovanka to sign the Nominee Agreement as "a favor to help me out," (Tr. 450:21-451:5), and that Zaric himself explained to her "really nicely that *I cannot be the owner* . . . because of the liability issues . . . , and I told her I want to be the investor from her side to help her out *with her investment.*" (Tr. 452:2-5 & 452:12-15 (emphasis added).) He also testified that he could not be an owner of PHMX because of his potential involvement in a publicly held trucking company and his non-compete obligations imposed by that involvement. (*E.g.*, Tr. 570:21-571:2.)

Some of the inconsistencies between the Nominee Agreement and Zaric's second-day testimony can be partially explained by the fact that Zaric created this document himself as a cut-

---

[18] "Q. Did you have discussions just with Kari Kazumian and you about the project? A. No, never." (Tr. 373:24-374:1.)

and-paste job from templates he found online, (Tr. 454:1-11), and he obviously did not understand what some of the key terms meant. For instance, when asked to explain his understanding of the term "nominee" in the Agreement, he answered:

> [T]hat she's going to be on the safe side. God forbid something go wrong, I'm going to jump in. I'm going to fix the issues. That just it's kind of like a contract between two people where someone is holding certain assets for them, and *I give her [the] opportunity to put some of her money to give her some percentage.* I believe it was between 25 and 35 percent. I cannot [recall] exactly because of verbal what we agreed.

(Tr. 452:17-25 (emphasis added).)

Similarly, when asked what the Nominee Agreement meant by the term "pro rata" when it provided that the nominee retains her pro rata legal and beneficial interest in the PHMX shares, Zaric gave the following testimony:

> Q. . . . The nominee otherwise has their pro rata legal and beneficial interest in the PHMX shares. What was your understanding of what 'pro rata' meant?
> A. Pro rata means if, let's say the company went to the bankruptcy or whatsoever or we need to sell it, that let's say if I have certain shares and everything that interest going to go, you know, like legal. You know, that I'm going to be – that I am going to have the share of that company so she –
> . . .
> Q. Now, it says at Part A that the nominee will hold all the portion of their rights, title and interest in the PHMX.
> A. Correct.
> Q. Sole benefit on behalf of the owner. But then it says the nominee otherwise has their pro rata legal and beneficial interest in the PHMX share.
> A. Yes.
> Q. What did you understand that to mean?
> A. I just wanted to make sure something like this would happen or whatsoever and I invest a half million or a million, that one day I can jump and help her because she's older lady and just fight for both of us.

(Tr. 455:24-456:9 & 457:1-15.)

Perhaps most significantly, Zaric's intention that Jorgovanka be the sole owner of a 50% membership interest in PHMX is established by the Secured Promissory Note, (Trustee's Ex. 50), another cut-and-paste job by Zaric. (Tr. 464:18-23.) Although Zaric's testimony was frequently inconsistent, his testimony on direct examination regarding the $500,000 note is consistent only with his testimony suggesting that he wished for *Jorgovanka* to be the owner in both law and equity in 50% of PHMX:

> Q. Mr. Zaric, what is this agreement [i.e., the promissory note]?
> A: It's agreement between me and Jorgovanka like I promise and I deliver. I'm going to invest into the company *on her behalf as the owner*, and I just want to secure myself if something happens, I can get my money in some way.
> Q. Well, why was this a note with Jorgovanka?

15

A. Because I had a personal agreement with Nick Kazumian that for his mother
Shogher – Shogher Zargaryan, I'm sorry, that he want to be investor, and we want
to do dollar-for-dollar like two of them sign the operation agreement, so I promise
that I want to invest and help Jorgovanka Dordevic and he want to do the same
thing on his side for his mother.

. . .

Q. Who wrote this?

A. Who wrote this? Honestly, it was one of the notes that I had in the trucking
business and some other, you know things. So not really from the trucking. In
general, you know. So I strongly believed that I had something similar so I needed
to adopt. I can't remember exactly. I remember I was in Chicago when I created
this document, and we signed in Chicago. I think it was done in my office.

. . .

Q. *How was this presented to Jorgovanka?*

A. *I explain her that this is the note that she wants to get money, and in any case
or something happen because she the owner of the company, I would like to go to
her for my money.* So I didn't plan to go with nominee to go against my money, of
course. I just was thinking with this note to secure myself. *Nominee was just
protecting me to be a silent investor.* So with nominee I didn't want to take anybody
anything, but with this I want to protect myself. That's why I did this document.

(Tr. 463:18-464:8, 464:19-465:3, & 465:8-19 (emphasis added).)

By the terms of the Secured Promissory Note, Jorgovanka, as borrower, promises to pay
Zaric the principal sum of $500,000.[19] But, as of March 1, 2018, the date of execution, *there was
no debt between the two*. The only conceivable explanation for the Note is that it was designed to
evidence a loan from Zaric to Jorgovanka of the payments that Debtor was making (supposedly)
to Zaric by means of wire transfers to Pharmix. That is, the Secured Promissory Note seems
intended to reflect the three-part structure outlined earlier in this Opinion whereby Debtor "pays"
Zaric under the Stock and Sale Purchase Agreement, Zaric "loans" that money to Jorgovanka, who
then "invests" it in Pharmix. The loan and investment components are undocumented phantom
transactions that the Court is asked to believe occurred simultaneously with, and are collapsed into,
the direct wire transfers from Debtor to Pharmix. The Court is not buying it.

As for Jorgovanka's understanding of the documents she signed, it was all over the map.
In her post-trial brief, she states that "[s]he understood that she was holding an interest in the name
of Zaric." (Def.'s Br. at p. 4; *see also id*. at p. 19.) Yet her trial testimony blatantly contradicts that
assertion:

Q. Do you have an ownership interest in property with Shogher?

A. Yes.

Q. Is that property known as PHMX?

---

[19]   The Court notes that the principal amount stated in the Secured Promissory Note is short of the total amount
Debtor eventually wired to Pharmix. As of March 1, 2018, the stated date of the note, Debtor had wired only
$276,250 to Pharmix. Although her wire transfers did eventually total $773,250, they did not exceed the $500,000
mark until July 26, 2018, when a $100,000 wire transfer by Debtor to Pharmix pushed the total to $584,050. Thus,
as of March 1, 2018, $500,000 might well have appeared to Zaric to be a reasonable estimate of the total wire
transfer amounts.

A. Yes.

Q. How much of that property do you own?

A. One half.

Q. So you by yourself own one half of PHMX, correct?

A. Yes.

Q. You do not own half of PHMX for anyone else, correct?

A. No. It is correct that I don't own it for someone else.

(Tr. 126:23-127:11.)

Q. Did you believe that certain things being done in the company required your approval?

A. Yes. Yes. Solely my approval.

. . .

Q. Did anyone at the time explain to you what your rights and your responsibilities were in PHMX?

A. Yes, I know my obligations, and I'm the owner, and I am one of the managers.
And I spoke about that with Nikola.

(Tr. 291:24-292:1 & 297:16-21.)

Jorgovanka further argues that, apart from the funds that were initially deemed payments from Debtor to Zaric under the Stock Sale and Purchase Agreement and then loaned to her, she made a separate $112,000 contribution to advance the PHMX Project.[20] But at trial she provided no admissible evidence of any transfer in that amount directly from herself to the PHMX Project. In fact, her and Zaric's testimony established that that transfer had nothing at all to do with PHMX. Zaric testified that he wanted to send $112,000 to his father to renovate Zaric's house in Serbia. But sending the money directly to his father could have triggered fraud alert notices under Serbian currency restrictions and significantly delayed his father's access to the money.[21] To avoid that result, Zaric transferred $112,000 to Jorgovanka, with the understanding that Jorgovanka would then instruct her son, Igor, to take an equivalent amount from their safe in Serbia to give to Zaric's father. And that is what happened.

While Zaric's testimony on direct examination characterized this payment as an investment in PHMX, his own description of the transaction showed unambiguously that it was nothing of the sort:

---

[20] At one point, she argued that the amount of her independent contribution was $147,000, (Tr. 128:7-129:1 & 131:8-16), but the contemporaneous documents and Zaric's testimony strongly suggest that the real amount in question was $112,000.

[21] Zaric testified:

And honestly one more thing you need to know why we did it this way also it was the timeframe. Because for Jorgovanka to open the account, if you send international wire hundred thousand, the fraud protection would have locked the money from 10 to 15 days.

We was in the closing time purchasing the building. Because didn't have money, they put the pressure, and I need to react fast. So I decide to keep this money there and invest my own money, you know, right there to give to [Debtor]. Make purchase available.

(Tr. 565:3-15.)

Q. Did Jorgovanka ever to your knowledge invest in PHMX?

. . .

A. Jorgovanka, yes.

Q. Do you know how much she invested?

A. Yes, I know. I give the funds to Debtor. My father get in Serbian 112,000 and the same amount of money in a day or two from my personal funds I ask Debtor where to be transferred because Jorgovanka didn't have account, and I transfer to the Debtor account for her bill.

Q. And you transferred it to Debtor's account for what purpose?

A. For just to set up. Her father give to my father money. I needed to give him the money. So I know she wanted to invest into the business so I just give the account what they wanted, and they want to send to the Pharmix or whatever, Nick Kazumian and Kari, they said this account to that account.

Q. How much money did she give to your father?

A. She gave $112,000 exactly.

Q. Okay. So did that 112,000 ever make it to America?

A. Honestly I have agreement. I have a house in my name in Serbia that was the old house 1945 that need a lot of renovation. I have all the pictures and everything. My parents are in retirement, so it was kind of gift from me to them. That money stays in Serbian, and I took the obligation that money to give to Debtor and to – to – I'm sorry, to Jorgovanka through Debtor account.

(Tr. 471:25-473:9.)

<u>Non-Financial Contributions to the PHMX Project</u>

Both at trial and in the parties' post-trial briefs, much emphasis was placed on evidence regarding the various non-financial contributions to the PHMX Project made by Debtor, Jorgovanka, and Zaric. The defense devoted most of its direct examination to witnesses testifying that Debtor's involvement in the day-to-day running of the PHMX Project was minimal, while Zaric's was considerable. The testimony regarding Zaric's involvement was hotly contested by Shogher, Nick, and Kari.

The Court weighs the testimony on this issue in the context of evidence adduced on other matters, in particular Zaric's apparent disclaimer of any membership interest in PHMX and assertion that Jorgovanka owns 50% of PHMX, legally and equitably. The significance of that disclaimer is considerable. First, it renders Zaric's testimony contrasting his allegedly considerable involvement in PHMX against the allegedly minimal involvement of Debtor irrelevant to the issue before the Court: Who owns 50% of PHMX? Second, because that testimony is irrelevant to the Court's decision, the Court need not resolve the issue of whether Zaric's testimony as to his participation in the PHMX Project is more, or less, credible than that of Shogher, Nick, and Kari.

Regarding Debtor's non-financial contributions to the PHMX Project, the Trustee touts her "intimate . . . day-to-day involvement," "including paying expenses, monitoring the delivery of equipment from China, arranging for financing, and arranging for the cleaning of portable toilets at the construction site." (Trustee's Br. at p. 1.) The Trustee goes on to list more than a dozen specific acts offered as evidence of Debtor's active involvement in the construction at the Miami site, (Trustee's Br. at pp. 5-6), which she visited multiple times. (Tr. 351:16-352:2 & 537:7-13.)

But Debtor herself testified, "I was never involved with anything even. I would be shocked if I hear that somebody says I was involved." (Tr. 392:10-12.) The Court has already weighed in on the issue of Debtor's credibility in general. In particular, Debtor's testimony is flatly contradicted by the contemporaneous documents. The Court therefore gives no weight to it. However, in minimizing Debtor's role as more secretarial than managerial, Jorgovanka also relies on more credible testimony given by Shogher, Kari, and Nick. Jorgovanka cites parts of their testimony that suggested that Debtor's primary role was merely handling the payment of bills. But also, oddly, Jorgovanka highlights this response from Nick Kazumian:

> [Debtor] on a daily basis or every other day, she was involved in every single important decisions [sic] which are not trade related, which means all the operations which she with her personal intelligence can be involved with she was doing that because she was feeling obligated to be upfront and help with every single portion of the development that we have at the moment.

(Def.'s Resp. Br. at pp. 6 & 7 (quoting Tr. 618:4-11), Adv. Dkt. 81.)

This certainly seems to support the *Trustee's* case. But Jorgovanka characterizes this as "doubletalk on the fly" designed to explain away "the lack of evidence of [Debtor's] *management*" of the PHMX Project. (Def.'s Resp. Br. at p. 7 (emphasis added).) Indeed, throughout her post-trial submissions, Jorgovanka seems to be laboring under the mistaken impression that the Trustee bears the burden of proving that Debtor was (as Jorgovanka variously puts it) a "manager" of PHMX (*e.g.*, Def.'s Br. at p. 16), its "mastermind" (Def.'s Resp. Br. at p. 5) or "kingpin," (Def.'s Br. at p. 15), "part of the founding of the business," (Def.'s Br. at p. 9), and responsible for "orchestrating the formation of PHMX, the purchase of the Miami land, and the retention of Pharmix," (Def.'s Resp. Br. at p. 5). No. The Trustee bears the burden of proving the issue of which Jorgovanka was given notice in the Trustee's complaint—whether Debtor is the true owner of a 50% membership interest in PHMX. The fact that Debtor wired $773,250 to Pharmix is, on its own, powerful evidence that she is. *Any* significant involvement in the PHMX Project on her part, whether managerial, secretarial, or otherwise, is simply further evidence in support of that conclusion, as it evinces her interest in seeing the business she invested in succeed. It matters less whether she did in fact perform every act on the Trustee's list, or whether her participation was, as Jorgovanka alleges, essentially limited to billings and payments. (*E.g.*, Def.'s Br. at p. 15.) What matters is that, however great or small her level of involvement was, it was obviously sufficient for those whom Jorgovanka agrees were the real "masterminds" behind the PHMX Project— Shogher, Kari, and Nick. As stated earlier in this Opinion, they were not seeking additional managerial or technical expertise to get the PHMX Project off the ground. Rather, they were seeking financial investors, and they found one in Debtor. Any additional service she provided to the PHMX Project was apparently welcome, useful and considerably more than de minimis (*see* Nick's "doubletalk" quote above). It may not have been absolutely indispensable to the PHMX Project, but it did not have to be to justify Debtor's 50% membership interest in PHMX. That justification was provided by her financial contribution.

In contrast, Jorgovanka would have had to make a prodigious contribution of in-kind services to warrant a 50% stake in PHMX to make up for her lack of any financial contribution. Both Jorgovanka and Zaric stated that she does have managerial experience arising from her operation of several fast-food restaurants in Niš, Serbia. (Tr. 280:6-14 & 578:11-15.) But the record is devoid of any indication that Jorgovanka possesses the necessary managerial skills to

oversee a complex commercial construction project or the technical background to add value to a complex and novel pharmaceutical business. The record also fails to identify even one specific act of managerial or technical assistance by Jorgovanka for the benefit of the PHMX Project. Zaric testified that he observed Jorgovanka visiting the construction site several times, but he offered no explanation of what she actually contributed there.[22] (Tr. 537:2-6.) Nor could Jorgovanka answer basic questions about the property, including its address, approximate square footage, and from whom it was purchased. (Tr. 127:18-128:2.)

Shogher, the co-owner of PHMX and the driving force behind the PHMX Project, testified that even though Jorgovanka was nominally a co-owner of PHMX, she only met Jorgovanka twice—when "they invited us for a meal, and another time I invited Debtor for a meal in which occasion she brought [Jorgovanka] with her." (Tr. 160:2-5.) She further testified that she never had any conversations with Jorgovanka about the PHMX Project for three reasons: (a) "her lack of knowledge of business," (Tr. 158:20-21), (b) Jorgovanka "doesn't know much about the industry or her level of understanding doesn't meet my level," (Tr. 159:1-3), and (c) Jorgovanka was not "able to communicate with me at the level of communication that I am able to communicate, whether it was in the Armenian and Russian or French or the languages that I spoke, so there was a lack of communication." (Tr. 159:4-8.)

The Court finds Jorgovanka's financial and non-financial contributions to the PHMX Project to be equally non-existent.

## FINDINGS AND CONCLUSIONS

Applying the Seventh Circuit's standards as set forth in *United States v. Szaflarski*, 614 F. App'x 836, 838-39 (7th Cir. 2015), the Court finds as follows:

1. Relationship between the parties: There is obviously a close personal relationship between Jorgovanka and Debtor. They are mother and daughter and Jorgovanka lives with Debtor as her dependent.
2. Consideration paid by the nominee:
   a. Jorgovanka paid nothing for her nominal ownership of the 50% membership interest in PHMX. No money passed hands from Debtor to Zaric or from Zaric to Jorgovanka. The only documentation to support the alleged "loan" from Zaric to Jorgovanka is the Nominee Agreement and the Secured Promissory Note, neither of which were ever shared with the principal actors behind the PHMX Project, Shogher, Kari, and Nick. As Zaric testified, "Why should I? It was none of their business." Exactly. It was none of their business because it had nothing to do with their business.
   b. In addition, she did nothing to advance the business interests of PHMX. Jorgovanka is the least likely co-owner of a cutting-edge pharmaceutical business that one can imagine. She has no technical or managerial experience

---

[22]   On direct examination, Zaric stated that Jorgovanka took pictures of the Miami property for her son and that "she was really kind of curious about the whole project." (Tr. 493:6-7.) That's an odd description to be sure, as most businesspeople investing in seven-figure projects possess more than idle curiosity in the endeavor.

in this area, she had no funds of her own to invest, and she lacks the language skills to even communicate with the other co-owner.

3. <u>Intention to avoid collection activity</u>: The Court heard testimony that Debtor placed Jorgovanka in the position of nominee in order to avoid alerting the immigration authorities to her 50% membership interest in PHMX. But her significant omissions of her debts and assets in her bankruptcy schedules also support the conclusion that she placed Jorgovanka in the position of nominee in order to shield her 50% membership interest in PHMX from her creditors.

4. <u>Transferor's exercise of dominion and control over the property</u>: The "property" at issue is not the tangible assets of PHMX, it is a 50% membership interest in PHMX LLC. The evidence introduced at trial establishes that Debtor exercised dominion and control over that membership interest by becoming deeply involved in certain management functions at PHMX, including but not limited to billing and dealing with vendors to the PHMX Project.

For all of these reasons, the Court finds and holds that the Trustee has met his burden of establishing that Debtor is the true equitable owner of Jorgovanka's 50% membership interest in PHMX LLC and is entitled to exercise the rights accorded to him by that status. Judgment is entered in favor of the Trustee and against Jorgovanka under Counts I and II of the complaint. Count III of the complaint is moot.

**ENTERED:**

DATE: September 22, 2021

**Donald R. Cassling**
**United States Bankruptcy Judge**